Sorenson, Adm'r, vs. The Menasha Paper and Pulp Co.

SORENSON, Administrator, vs. THE MENASHA PAPER AND PULP COMPANY.

*November 25 — December 12, 1882.*

*(1) Negligence: Death from unaccountable accident. (2) Presumption of suicide.*

1. Plaintiff's intestate, an employee of the defendant, was found bruised and dead in a hole which had been cut in the floor of defendant's mill, and in which was water about six feet deep. Upon all the evidence (stated in the opinion), it is *held* that there are no facts from which the question of the negligence of the deceased can be determined. How he came into the hole and was killed is left wholly to conjecture. So far as appears it was an unaccountable accident and calamity. A nonsuit was, therefore, properly granted.

2. A presumption of suicide cannot be indulged in as a mere presumption without any fact or circumstance upon which it can be logically predicated.

APPEAL from the Circuit Court for *Brown* County.

Action to recover for the death of the plaintiff's intestate, alleged to have been caused by the negligence of the defendant. The facts are stated in the opinion. The plaintiff appealed from a judgment of nonsuit.

For the appellant there was a brief by *Weisbrod & Harshaw*, and oral argument by *Mr. Weisbrod*.

For the respondent the cause was submitted on the brief of *Gabe Bouck*.

ORTON, J. On the conclusion of the plaintiff's evidence the circuit court granted a nonsuit, and to determine whether properly or not, the substance and effect of that evidence must be considered. The defendant company had for a long time owned and operated this paper and pulp mill. The building stood facing an open street towards the east, about 162 feet in length. From the north end towards the south, about forty-six feet, there was the main entrance by a door

over five feet wide, and always open for the entrance and exit of all persons employed in that part of the building. About seven feet south of this entrance there was a door about three feet wide, which had been used as the entrance to the office of the proprietors, and about seventy-eight feet south of this door there was another door, leading into the machine-room, for the accommodation of those employed therein. Near the southeast corner of the building there was a well, where the employees obtained drinking water.

The north end of the building is a short wing, in which the " rotary " is situated, near the west side, where the deceased worked. Near the rotary to the south are the " beaters," five in number, extending to the west end of a wing. In the south wing is the paper machine. From the rotary to the main entrance door is about forty-two feet in a line to the southeast. From the main entrance to a point a little north of one of the beaters, about thirty-two feet, there was kept a kerosene lamp burning on a post eight inches square, and another on a similar post towards and near the rotary, about eleven feet from the first one, and another light near the northeast corner of the rotary, about fifty feet from the main entrance. There was another lamp near and south of the lower beater, thirty-six feet from the main entrance, and one about eight feet west of it and directly southwest of the main entrance about forty-eight feet, and two others east of the paper machine about sixteen feet apart. All of these lamps would cast light without obstruction to the main entrance. The office was partitioned off from the main room perhaps about fifteen feet by twenty feet, the southeast external corner of it within about six feet from the main entrance, and the office door opening from it into the street. For the purpose of improving the machinery the partitions had been taken away, except a small part on the southeast side, on the 18th day of August, and the safe was left standing near the northeast corner of the room as it had been.

Before the accident, and on Saturday, the 20th of August, a square hole or slit was cut in the floor, north and south, seven by nineteen feet, the north end near the safe, and lengthwise, nearly opposite the office door, and about five feet from it. It was afterwards filled up one foot on each side with timbers. There was water in this hole six feet deep, which communicated with the wheel. The mechanics of the defendant worked upon this job on Saturday, Sunday, and Monday. The last day, in the evening, was the time of the accident. On Saturday, when they left the work in the evening, they put a fence around it, and on Sunday they covered it, and on Monday they put two planks on top of each other part of the way, and then separated in the middle, lengthwise of the hole. There was a pile of planks lying on the north side of the hole about two feet high. About eight o'clock in the evening of the 22d day of August the deceased, who had been employed by the defendant for a few weeks only, and whose duty it was to carry straw from the rotary to the beaters, took a small pail and started to go for drinking water at the well. That is the last time he was seen alive. Louis Larson, who worked at the beaters, after waiting for a half hour, became alarmed and proceeded to search for him, and went out the main entrance and looked along the street, and while standing outside, opposite the main entrance, he looked through the open office door and saw the black cap of the deceased lying on the east timbers of the hole. Then search was made in the hole and below, and his lifeless body found with the head bruised and other wounds. There was water on the plank over the hole, as if spilled there from his pail on his return from the well. The lamps cast light, although not a strong light, to the doors, and the cap was seen by Larson *by this light*. The hole was from six to twelve feet from the line of the proper course of the deceased going to and coming from the main entrance north of the hole. The deceased knew all

about the hole, and saw it on that day. The office door was found open by Larson, but there is no evidence that it was left open when the mechanics left their work that evening, or that it was ever left open. If it was open, and mistaken for the main entrance by the deceased on returning from the well, his direct route of return to the rotary or the beaters would have been north of the hole, and not westwardly across it. There is no evidence that the office door was ever used by the employes going to and returning from their work, but the main entrance was always used for that purpose by those employed in that part of the building. The night was dark, according to the evidence, but could not have been very dark, at that season of the year, between eight and nine o'clock in the evening, unless very cloudy.

These are the main facts in evidence, and, we think, fairly stated, upon which the nonsuit was granted. How the deceased came into the hole and was killed, is left wholly to conjecture. There are no facts in evidence by which the jury, or any one, can form a certain opinion upon the subject, so as to clearly determine the question of his negligence. How, then, can an intelligent verdict be rendered? In principle this case, in this respect, falls within the decision of *Smith v. C., M. & St. P. Railway Co.*, 42 Wis., 520, where there was no fact in evidence upon which the finding of the jury that the defendant company was negligent could have been predicated, and the judgment was reversed on that ground. In that case the present chief justice said in his opinion: " It is very obvious that the verdict must be founded upon evidence, and the jury could find no fact not established by or fairly inferable from the testimony given." And again: " For there is absolutely no evidence which tends to show that the company was guilty of negligence in not applying a proper and sufficient test to the brake-rod." This principle is, perhaps, more pointedly decided in *Morrison v. P. & C. Const. Co.*, 44 Wis., 405, where the defect in the car-wheel was of such a

character that it was not known and could not be, how the accident occurred, and there was, therefore, no evidence on which to predicate the negligence of the company. In that case it is said in the opinion: "The respondent's liability depending upon the carelessness or fault of its agents, employees, or managers in some way, and the appellant's right of recovery depending upon the same being clearly shown by evidence, and it being his duty to furnish such evidence, it certainly was incumbent upon him to show *how and why the accident occurred.*" The negligence of the plaintiff is as material a fact in such cases as the negligence of the defendant, and it is as essential that there should be in evidence some fact or facts by which it could be determined by the jury, and we may well say in this case as in that: "From all that appears in the evidence, it was a *mere accident* and *unaccountable.*" ·

Judicial determinations must rest upon facts, and legal liability must be determined by the law in application to facts. These rules will not exclude circumstantial evidence, for such evidence is often the strongest, but such evidence after all must establish facts. Here it is left entirely to conjecture, guess, or random judgment upon mere supposition, without a single known fact.

The presumption contended for by the learned counsel of the respondent, that the deceased committed *suicide,* cannot be indulged in as a mere presumption, without any fact or circumstance upon which it can be logically predicated; for the presumption of the law is in favor of life, and the natural desire and struggle to preserve rather than to destroy it. The presumption is that he fell into the hole accidentally, and perhaps carelessly. We may, perhaps, indulge in the presumption from the circumstances that on his return from the well he entered the office door by mistake, instead of the main entrance, and went directly west instead of northwest, the direction of his work, and stumbled, dropped his cap on the

timbers before it, and fell into the hole and was drowned, or killed by striking his head against something on the way, as the most reasonable surmise or conjecture; or that he found the office door open and did not distinguish it from, and supposed it was, the main entrance.

But against these presumptions is the fact that the main entrance was over five feet wide, and the office entrance only three feet. It would seem that he could have seen from the outside the difference in the doors; especially that he could have done so if the office door was shut and he opened it. When it was opened, in looking into the room at that time the lights within were sufficient to at once notify him of the mistake, for they cast some light to the entrances, and the darkness without would have made the light within more visible, even though his eyes might have been partially blinded by the darkness without. The lights must have cast their rays even through the main entrance so that it could have been easily distinguishable. If he entered the office door he went in the wrong direction. For if he supposed he had entered by the main entrance, to which he was accustomed, his proper direction was to the right sufficiently to have carried him *by* the hole in entering the office door. He knew where the hole was and its character, and although the lights might not have shined into the hole, they must have indicated its situation, for they were all about it and not very far distant in the open room beyond it.

It is therefore apparent that even these presumptions are not very reasonable, and they rest on no known facts. But admitting them to be tenable, they show negligence on the part of the deceased. If the deceased knowingly entered the office door instead of the main entrance, with a knowledge of the hole and its situation, whether open or closed, and attempted to pass over it out of his proper direction to his place of business in the building, he was unquestionably negligent. The witness Larson saw the black cap of the de-

ceased lying on the verge of the hole by the light of the lamps within, while he was standing a few feet from the office door in the street.  This would seem to be conclusive of the ability of the deceased to have seen and known his situation when going into the building by either entrance. The trouble is, there is no theory we can possibly form, resting upon any known facts or circumstances, or in mere presumption or conjecture, that is satisfactory or entirely reasonable.  But on all the theories and presumptions claimed by the learned counsel of the appellant, the deceased would seem to have been negligent.  It is perhaps sufficient, however, that the question of his due care or negligence cannot be determined by any facts in evidence.  It was, so far as we know, *an unaccountable accident and calamity*.

If we consider the case in respect to the negligence of the defendant, it is by no means clear that there was any proof of it.  The hole was made by the mechanics of the company in the proper improvement of the mill.  It was situated where none of the workmen in the mill had ever passed or repassed in going to or coming from their work or in doing anything requiring them to pass out or into the mill, and where it could not reasonably be expected any of them would go for any purpose.  The office door had never been used as an entrance into the mill except into the office part of it. The hole had been but lately opened, and the mechanics, with due diligence, were engaged in constructing machinery therein.  For two nights it had been left closed or protected, and on the fatal night it was partially closed.  A plank had been placed over its center the full length, leaving only some two feet open in any place on each side, and a part of the way much less, by the spreading of the planks.  There was no proof that the office door was left open on that evening. No one could have reasonably supposed or anticipated that any one would pass in by that door, and much less that any one would attempt to pass over that hole.

It would be difficult to say, under such circumstances, that the defendant was guilty of a want of ordinary care. The questions of law entering into the consideration of such a case are elementary, and no authorities are necessary. The case in this court rests entirely upon the facts, and for that reason this opinion has considerable length in order to be intelligible, and show sufficient reason for affirming the judgment.

*By the Court.*— The judgment of the circuit court is affirmed.